# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

SINAI HOLDINGS, LLC,                                           **Case No. 23-62159-CIV-WPD**
a Florida limited liability company,
and JACOB GITMAN,

      Plaintiffs,

vs.

JPMORGAN CHASE BANK, N.A., a foreign
profit corporation,

      Defendant.
_____/

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs, SINAI HOLDINGS, LLC ("Sinai"), a Florida limited liability company, and JACOB GITMAN, an individual ("Gitman") move for partial summary judgment under Fed. R. Civ. P. 56 and Local Rule 56.1.

## INTRODUCTION

This case concerns Chase's deliberate abuse of its compliance infrastructure to falsely tar Plaintiffs Jacob Gitman and Sinai with the worst crimes imaginable—terrorism, trafficking, and national security threats—using its false "OFAC Sanctions Statements." These statements started in mid-2020 and continued until now, including when Gitman just tried making a settlement payment to a creditor on a multi-million dollar liability that arose due to Sinai's collapse after the OFAC gossip spread like fire. SMF ¶ 97-99. None of Chase's false statements resulted from human error or miscommunication. The statements were the product of a Chase-designed system that produces defamatory messages as a matter of policy—even though Chase knows the statements are categorically untrue. SMF ¶¶ 19-23.

The U.S. Treasury's Office of Foreign Assets Control ("OFAC") never sanctioned Plaintiffs. SMF ¶ 4. Nor did OFAC ever investigate them, or have any programs including them. Id. Yet Chase's Sanction Service Utility department ("SSU") repeatedly told others that transactions to Plaintiffs were being cancelled "due to Sanctions and/or internal JPMC policy" and that the cancellations were part of an "OFAC investigation" or were subject to being "blocked" or "rejected"—unique to Sanctions, at least in banker talk—because of a "sanctioned program." SMF ¶¶ 19-26, 73-80 . These statements were pushed through the global SWIFT bank messaging system and other electronic messaging systems to correspondent banks, third-party institutions, and business associates. SMF ¶¶ 24, 73.  Chase's messages caused Plaintiffs' reputational annihilation, financial collapse, and effective segregation from the banking ecosystem.

The record confirms that Chase sends these messages not when sanctions are real, but when they are not—because the targeted party is on Chase's separate, unregulated, and unverified "Interdiction List." SMF ¶ 20. Chase's mindless bureaucracy perfunctorily added Plaintiffs to the Interdiction List relying on material falsehoods that any good faith due diligence would have uncovered. SMF ¶¶ 45-69. Further, Chase's policies require the OFAC Sanctions Statements only in connection with these non-OFAC cancellations. The messages are thus false every time they are sent. SMF ¶ 20-23 Worse still, Chase knows they are false every time. And Chase refuses to stop sending them.

Accordingly, because every reasonable juror could only find that these OFAC Sanctions Statements were always false, defamatory, not privileged, and extreme abuses – devoid of any duty, propriety or good faith – this motion seeks summary judgment on Counts I through IV for defamation and defamation by implication, and for declaratory, injunctive and other equitable relief under Counts V and VI. Chase cannot dispute the facts. Its own documents and testimony confirm them. The law is settled. Plaintiffs are thus entitled to a partial judgment as a matter of law, leaving only damages to be determined at trial.

## STANDARD OF REVIEW

Summary judgment is appropriate when viewing the evidence in the light most favorable to the non-movant, the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant bears the initial burden to show that the material facts are undisputed. *Id.* at 323  For issues where the non-movant bears the burden at trial, the movant may meet this burden by "'showing'—that is, pointing out to the court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party meets this burden, the nonmoving party must point to specific evidence in the record that establishes a genuine issue of material fact from which a reasonable jury could return a verdict in its favor. *See id*. at 323-34; *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Mere "metaphysical doubt as to the material facts" will not suffice. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ARGUMENT

### I. Chase's OFAC Sanctions Statements are false and defamatory.

With respect to Plaintiffs' counts for defamation *per se* and defamation by implication (Counts I-IV), as well as Plaintiffs counts for tortious interference/injunctive relief and for declaratory relief (Counts V-VI), no reasonable juror could find that the OFAC Sanctions Statements are not false and defamatory. *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008) (private defamation plaintiff must show that the statements were made intentionally or negligently and are, among other things, false and defamatory); *Nautica Intern., Inc. v. Intermarine USA, L.P.*, 5 F. Supp. 2d 1333, 1344 (S.D. Fla. 1998).  *Per se* defamation occurs whenever the plaintiff is accused of committing a crime that may constitute a felony or the statements impugn his trade or profession *See Akai Custom Guns, Inc. v. KMM Precision, Inc.*, 707 F. Supp. 3d 1273, 1295 (S.D. Fla. 2023) (citing *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953))  (); Defamation per se "gives rise to an absolute presumption both of malice and damage." *Wolfson v. Kirk*, 273 So.

2d 774, 776 (Fla. 4th DCA 1973) "The elements of defamation by implication are (1) a juxtaposition of a series of facts so as to imply a defamatory connection between them, or (2) the creation of a defamatory implication by omitting facts." *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1247 (S.D. Fla. 2014) (citing *Rapp*, 997 So. 2d at 1106))). "[D]efamation by implication applies in circumstances where literally true statements are conveyed in such a way as to create a false impression." *Rapp*, 997 So. 2d at 1108.

Chase cannot dispute that its system disseminated statements to third parties claiming that transactions involving Plaintiffs were cancelled "due to Sanctions and/or internal JPMC policy," and, in numerous instances, referenced a non-existent "OFAC investigation" in the subject line, or a "sanctioned program" of which Plaintiffs were never members. SMF ¶¶ 72-80. The SSU sent these messages associating Plaintiffs with horrible international crimes worthy of sanctions through SWIFT and other electronic platforms to correspondent banks, financial institutions, and business associates. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 432 (2021) (falsely associating an individual or company with OFAC sanctions is per se reputational harm because it equates to labeling them as terrorists, drug traffickers, or human rights violators). The OFAC Sanctions Statements were not theoretical alerts. They were published—intended to be read, interpreted, and acted on by third parties. They were. And they are plainly false. As Chase admitted in its testimony, it has no knowledge of Plaintiff ever being subject to OFAC sanctions or investigation and its decision to place Plaintiff's on the interdiction list was unconnected to OFAC concerns. SMF ¶¶ 72-73. Yet Chase's communications falsely state the opposite. By Chase's own design, the SSU only sends these messages where Chase cancels the transaction for non-OFAC reasons. SMF ¶ 20. Chase adopted standard language that has no basis in reality.

Chase cannot hide behind the ambiguity of the phrase "Sanctions and/or internal JPMC policy." That language has three possible meanings: (1) that the transaction was blocked due to OFAC sanctions; (2) that the transaction was canceled due to Chase's internal policies; or (3) that Chase stopped the transaction for both reasons. But two of these three meanings are indisputably always false about Plaintiffs, and only the third is possibly accurate—if one assumes the recipient ignores the first and thus primary "Sanctions" reference entirely. So when Chase includes the sanctions possibility that it knows is always false, that means that the statement is entirely false. And Chase cannot present any evidence that anyone ever understood the message the way it interprets it. But people who have received the OFAC Sanctions Statements have interpreted the messages to mean that the transactions were cancelled because of sanctions. SMF ¶ 89. As such,

Chase did not innocently approximate the truth. It hard-coded a false message into its compliance infrastructure—knowing full well that the message would be read as a declaration of sanctions-related illegality and OFAC-level criminality. It used "Sanctions and/or internal JPMC policy" language only when OFAC Sanctions were not involved, while deliberately implying the opposite.

At bottom, while the gist of the OFAC Sanctions Statements is false, Chase may argue that its message is technically accurate because the use of "and/or" includes the possibility that the cancellations were based solely on internal policy. But this argument collapses under the weight of Chase's own conduct. Chase's SSU led with "Sanctions" and framed its message in terms of an "OFAC Investigation" and a "sanctioned program," while omitting the truth—that Plaintiffs had never been sanctioned, investigated, programmed, or even reviewed by OFAC. The net effect was a statement that was literally false, misleading and defamatory *per se* and by implication.

## II.  Chase's OFAC Sanctions Statements were made of and concerning Plaintiffs.

Under Florida law, a defamatory statement is actionable when a reasonable recipient would understand the communication as referring to the plaintiff, even if the communication does not explicitly name the plaintiff. It is enough to show that the statement leads the listener to reasonably conclude the defamatory reference is to the plaintiff based on context or surrounding circumstances. "The defamed person need not be named in the defamatory words if the communication as a whole contains sufficient facts or references from which the injured person may be determined by the persons receiving the communication." *Wolfson*, 273 So. 2d at 779.

Here, Chase's OFAC Sanctions Statements were understood by third parties as targeting Gitman and Sinai personally—even in cases where Sinai's subsidiaries were individually named or Gitman was not explicitly mentioned. This perception arose directly from Sinai's corporate structure and Gitman's central role in funding, overseeing, and managing all subsidiaries. SMF ¶ 89.  Sinai itself is merely a holding entity; thus, when Chase interdicted each subsidiary owned by Sinai, the market reasonably understood Sinai and its principal, Gitman, were the actual entities targeted by the purported OFAC sanctions. SMF ¶ 1.

The evidence also shows widespread actual identification. Counterparties explicitly communicated their belief to Plaintiffs that the OFAC-related issues involved Sinai and Gitman directly. SMF ¶ 89. In fact, Plaintiffs' principal lender providing a credit lifeblood to Sinai's rapidly expanding business explicitly cut ties and held Sinai in default as a result of its board hearing the OFAC rumors launched by Chase. SMF ¶¶ 93-95. This is also tangibly shown by Gitman's forced transfer of about 30 percent in Sinai's equity to Allen Licht's Athena, a third-

party entity not previously involved, to salvage ongoing operations and distance the enterprise from the tarnished reputation Chase created. SMF ¶ 96. Gitman's compelled divestiture starkly illustrates that the market perception—entirely caused by Chase's false OFAC statements—was that Sinai and Gitman were the subjects of governmental penalties and restrictions. As another illustration, Plaintiffs had secured essential equipment from Sinopec, a critical supplier, to manufacture N95 masks for their Ohio-based production facility. When Chase cancelled payment, falsely alleging OFAC-related concerns, Sinopec informed Plaintiffs directly that they were on the 'OFAC list.' SMF ¶¶ 90-91. This defamatory cancellation caused a critical production delay of several weeks, directly compromising public health efforts and severely damaging Plaintiffs' reputation at a crucial time.

Turning more to the form of the messages themselves, Chase's SSU issued a formal communication on July 5, 2022, with the subject line "SSU OFAC Investigation Request for Details." This message explicitly directed the recipient to obtain "details of any direct or indirect affiliation/subsidiary/parent company relationship to Sinai Holdings LLC," confirming that Sinai was the focus of the supposed OFAC concern. The message also warned that "if a response is not received in a timely manner, the funds could be blocked/rejected in accordance with the sanctioned program." Of course, there is no "sanctioned program" to which Plaintiffs are subject-at all. *See* SMF ¶¶ 76–79.

These messages, disseminated through the SSU to intermediary and correspondent banks, were devoid of any clarification that no actual OFAC designation or legal sanction existed. Chase's repeated use of the "OFAC Investigation" subject line, combined with the direct identification of Sinai, supports the conclusion that the defamatory statements were "of and concerning" Plaintiffs, not merely their affiliated entities. A defamatory statement that names a plaintiff directly, especially in the context of an alleged investigation into sanctionable conduct, satisfies the requirement that the statement be "reasonably understood" as referring to that plaintiff. *See Thomas v. Jacksonville Television, Inc.*, 699 So. 2d 800, 802 (Fla. 1st DCA 1997); *Miami Herald Pub. Co. v. Ane*, 423 So. 2d 376, 389 (Fla. 3d DCA 1982).

Statements impacting closely held entities or single-entity holding structures necessarily implicate the reputations of the principal owner and the parent entity. *See Diplomat Electric, Inc. v. Westinghouse Elec. Supply Co.*, 378 F.2d 377, 381, 383 (5th Cir. 1967) (recognizing that defamatory statements about closely related entities reasonably implicate principals behind those entities). Here, Sinai is not merely affiliated with the affected subsidiaries but is the parent

company directly identified in the marketplace as the actual operating and financial entity responsible for the subsidiaries. Similarly, Gitman's reputation and credibility provided the essential foundation upon which these subsidiaries operated. Thus, the defamatory OFAC statements about transactions involving those subsidiaries naturally and necessarily defame Gitman and Sinai. Indeed, the explicit Chase communication directly naming Gitman in connection with purported OFAC sanctions unequivocally confirms the general marketplace understanding: that Chase's OFAC Sanctions Statements were, in fact, personally directed against Gitman and his holding company, Sinai.

In sum, under the reasonable understanding standard, these OFAC Sanctions Statements by Chase were clearly "of and concerning" Sinai and Gitman, despite the superficial naming of subsidiaries or omission of explicit names in some communications. Chase's deliberate falsehoods unmistakably damaged the business reputation of Gitman and Sinai, forced significant business concessions, and caused tangible financial harm and humiliation personally attributable to Plaintiffs.

### III.  Chase's OFAC Sanctions Statements were made without any privilege.

"One who publishes defamatory matter concerning another is not liable for the publication if (a) the matter is published upon an occasion that makes it conditionally privileged and (b) the privilege is not abused." *Nodar v. Galbreath*, 462 So. 2d 803, 809 (Fla. 1984) (quoting Restatement (Second) of Torts § 593 (1977)); Restatement § 600 ("one who upon an occasion giving rise to a conditional privilege publishes false and defamatory matter concerning another abuses the privilege if he (a) knows the matter to be false, or (b) acts in reckless disregard as to its truth or falsity"). When determining whether a qualified privilege applies, fairness and accuracy are basic requirements. *O'Neal v. Tribune Co.*, 176 So. 2d 535, 547 (Fla. 2d DCA 1965). "The essential elements of a qualified privilege are (1) good faith; (2) an interest in the subject by the speaker or a subject in which the speakers has a duty to speak; (3) a corresponding interest or duty in the listener or reader; (4) a proper occasion, and (5) publication in a proper manner." *Nowik v. Mazda Motors of Am. (East)*, 523 So. 2d 769 (Fla. 1st DCA 1988). A statement is privileged only if limited in scope to the speaker and listener's mutual interest. *O'Neal*, 176 So.2d at 542; *Rapp*, 997 So. 2d at 1112, citing *Demby v. English,* 667 So.2d 350, 353 (Fla. 1st DCA 1995) ("Under Florida common-law principles anyone who publishes defamatory matter is not liable if the remarks are published upon a conditionally privileged occasion and the privilege is not abused."). Chase cannot meet its burden for any prong of this defense.

First, Chase knew its statements were, are and will be always false when made. SMF ¶¶ 20-22. Chase's abuse of the qualified privilege thus prevents the defense from kicking in and destroys any privilege. Statements that are every time false simply cannot be made with a corresponding duty to speak and listen, on a proper occasion, in a proper manner, or in good faith. *See Valladares v. Bank of Am. Corp.*, 197 So. 3d 1, 7 (Fla. 2016) (discussing the importance of the "judicially created qualified privilege for those who may incorrectly but *innocently* report criminal conduct.") (emphasis added). No one ever has a duty to publish systemically false information around the banking and business globe, much less an interest in hearing always false information. Nor can Chase show how doing so would be proper or in good faith. On the contrary, the undisputed evidence shows that Chase: (1) has a policy of falsely using the OFAC Sanctions Statement template for non-sanctions-related interdictions; (2) made no effort to adhere to its own compliance verification procedures when deciding to debank and then blacklist Plaintiffs; and (3) spread those falsehoods to third parties in a manner that is unsolicited, SMF ¶ 19,73, inconsistent with industry norms, SMF ¶ 31, and steeped in extreme language.

Second, Chase may assert it reasonably relied on sources, such as an internet blog or transactional analysis in 2016 or 2019, as a basis for its interdiction which caused the always false defamatory OFAC statements. Yet the record indisputably shows Chase conducted no meaningful verification of this blog and then learned—from the blog's author's testimony—that the allegations were false. Nor is there any dispute that Plaintiffs did not even have accounts in 2016 for Chase to analyze transactions regarding to find Russian-Trump election interference, SMF ¶ 68, and its analysis in 2019 was done without conferring with its own KYC employees or talking to the Plaintiffs who knew that the transfers to separate bank accounts was required by the principal lenders funding Sinai's operations and growth. SMF ¶¶ 59-60. Such reliance on unverified and later discredited sources is inherently unreasonable. *See Diplomat Electric, Inc. v. Westinghouse*, 430 F.2d 38, 44 (5th Cir. 1970). In the end, Chase relied on a non-credible and uncorroborated blog post to arbitrarily justify placing Plaintiffs on its international Interdiction List—effectively exiling them from the banking ecosystem. Incredibly, that blog falsely alleged election interference and a "US Judge" asserting Russian mafia ties, SMF ¶¶ 50-56 —allegations that are categorically untrue, unsubstantiated, and were later contradicted by the blog's own author under oath – yet Chase's worldwide defamation continued unabated long after.

Finally, any ambiguity in the OFAC Sanctions Statement will not allow Chase to hijack and use a qualified privilege. A good-faith speaker would avoid this confusion by simply removing

"Sanctions" and "OFAC" references from the messages. While Chase testified that it can easily edit the messages, Chase did neither. It embraced the ambiguity and exploited it. That is not good faith or the proper manner or occasion to spread these falsehoods. That is strategic defamation. Based on all these undisputed facts and law, no reasonable juror could find that Chase could carry its burden on its qualified privilege defense.

    IV.    **<u>Chase's misconduct was not just improper—it was and is abuse.</u>**

Even assuming Chase could convince an unreasonable juror that it has a qualified privilege to defame on auto-pilot without any adherence to its own policies or banking standards, "the qualified privilege vanishes" when "the defamatory statement is made with express malice." *Am. Ideal Mgmt., Inc. v. Dale Vill., Inc.*, 567 So. 2d 497, 499 (Fla. 4th DCA 1990). A statement is made with express malice when made with a bad motive and not "made for a proper purpose in light of the interests sought to be protected by legal recognition of the privilege." *Nodar*, 462 So. 2d at 810. "This malice may be inferred from the language itself, or may be proven by extrinsic circumstances." *Id.*; *Grippa v. Rubin*, 133 F.4th 1186, 1198 (11th Cir. 2025) (explaining that evidence of express malice may be derived from "the style and tone" of the statement). Express malice can be proven through circumstantial evidence. *Arko Plumbing Corp. v. Rudd*, 230 So. 3d 520, 528 (Fla. 3d DCA 2017) (citations omitted).

First, let's focus on the words Chase sent through its "Sanctions Service Utility," including that Plaintiffs' business transactions must be cancelled "due to Sanctions" concerning an "OFAC investigation" and then, at times, "blocked/rejected"—OFAC sanction-only terms under Chase's own operating procedures —because of a "sanctioned program." SMF ¶ 14-15. All of these words as extreme as they are totally and materially false. Thus, while the Florida Supreme Court found that a parent's words—that an unqualified teacher was harassing and orally abusing their child—were not "so extreme as to demonstrate express malice," *Nodar*, 462 So. 2d at 812, the words Chase uses are indeed "so extreme," because they lump Plaintiffs together with "terrorists, human traffickers, drug smugglers, and proliferators of weapons of mass destruction." SMF ¶ 5-6. OFAC sanctions are used by the Federal government to punish the vilest kind of criminals. *TransUnion*, 594 U.S.at 432 (concluding that merely suggesting that someone was potentially subject to OFAC Sanctions equated to defamation because the person's reputation was harmed by being labeled "as potential terrorists, drug traffickers, or serious criminals.").

Thus, Chase's express malice is apparent from the defamatory statements themselves as Chase knows from its OFAC "sanctions" definition, as well as the definition promulgated by the

U.S. Treasury department who actually issues these tools to combat national security threats, *see* SMF ¶ 5, reserved for the worst criminals, including those proliferating chemical, biological, and other weapons of mass destruction, along with human and drug traffickers. An entity or individual that is involved with a transaction blocked by actual OFAC sanctions can themselves be subject to investigation and arrest. https://ofac.treasury.gov/faqs/topic/1501 ("Violations of OFAC-administered sanctions programs may result in civil and, in some cases, criminal penalties. Penalties for violations can be substantial."). Yet Defendant continues to knowingly communicate this false and extreme defamatory language about OFAC sanctions to a global, unsolicited audience. As a consequence, the "false and defamatory words" of the OFAC Sanctions Statements are "so extreme as to intrinsically show express malice." *Nodar*, 462 So. 2d at 812; *see also Myers v. Hodges*, 44 So. 357, 365 (Fla. 1907) (holding that a fact-finder may infer express malice from the defamatory statement's language such as including allegations not warranted by the facts or including information beyond what is reasonable). No reasonable juror could find otherwise.

Second, extrinsic circumstances also inescapably show that Chase abused any privilege it may assert. Express malice exists where a statement is made with knowledge of its falsity or for sham reasons. *American Ideal Mgm't, Inc. v. Dale Vill., Inc*., 567 So. 2d 497, 498 (Fla. 4th DCA 1990) (finding an abuse of the privilege can arise because "the reasons given for the termination of the management contract were false and a sham" and "the reasons were manufactured at a later time in order to afford false justification for the termination."); *Diplomat Electric, Inc.,* 430 F.2d at 44 (finding an abuse of the privilege because "[w]here a person has published a false statement and information thereafter comes to him from a reliable source which would put a reasonable person on inquiry as to the truth of such statement, and instead of making such inquiry he willfully republishes the false statement, the repetition of the defamation is strong evidence of malice.")

Here, Chase did far worse. Chase created a framework to automate its worldwide defamation of those on its Interdiction List, including Plaintiffs. Chase built and continues to maintain this system of humiliation in which the OFAC Sanctions Statements are falsely stated every single time someone on its Interdiction List is involved in a transfer. SMF ¶¶ 19-22. This is not a case of isolated misconduct—it is defamation by design. As such, Chase's actions reflect not only negligence or recklessness, but an express malice abuse.

In another stark illustration, although Ronald Uy, a Chase employee, pleaded guilty to facilitating illegal financial transactions involving Vadim Trincher and Anatoly Golubchik—all named in an FBI press release detailing their organized crime activities, *see* SMF ¶ 100-01 —

rather than an obscure and recanted blog—no one has any information that Chase ever interdicted or published OFAC statements against Uy, Trincher, or Golubchik. This stark selective enforcement reveals Chase's deliberate targeting and malicious intent toward Plaintiffs, who were wrongly accused based solely on the same unreliable blog source that implicated these actual felons. *Massi v. Flynn*, 254 Fed. Appx. 84, 87 (2d Cir. 2007)(finding selective treatment undermined an analogous claim of qualified immunity).

Similarly, by Chase relying on a non-credible blog to fantasize about election interference, non-existent transactional analysis, and false attributions to a U.S. Judge which the AMLOC decision makers confirmed was "important" to their perfunctory offline decision to approve Plaintiffs' global interdiction, *see* SMF ¶ , Chase abused any privilege it could have to publish these utterly embarrassing OFAC Sanctions Statements. *Arko Plumbing Corp. v. Rudd*, 230 So. 3d 520, 528 (Fla. 3d DCA 2017) (relying on unreliable and biased sources serves as circumstantial evidence of express malice); *McCurdy v. Collis*, 508 So.2d 380, 382 (Fla. 1st DCA 1987) (finding evidence of express malice because "the record indicate[d] that Exxon personnel based their decision that [plaintiff] was a safety risk on the basis of third party reports" and the institution "conducted no independent investigation."); *see also Corp. Fin., Inc. v. Principal Life Ins. Co.*, 461 F.Supp.2d 1274, 1294 (S.D. Fla. 2006) (finding evidence of express malice because the source of the information relied upon was motivated by an intent to injure plaintiffs). Here, nothing about the extrinsic circumstances surrounding the publications were fair, balanced, or grounded in reality. No reasonable juror could find that Chase still relying on uncorroborated falsehoods – even after years of being on notice of same through litigation about them – is anything but exploitation of its purported privilege.

"Express malice may be established indirectly, i.e., by proving a series of acts which, in their context or in light of the totality of surrounding circumstances, are inconsistent with the premise of a reasonable man pursuing a lawful objective, but rather indicate a plan or course of conduct motivated by spite, ill-will, or other bad motive." *Id.* (citing *McCurdy v. Collis*, 508 So.2d 380, 382 (Fla. 1st DCA 1987)); *S. Bell Tel. & Tel. Co. v. Roper*, 482 So. 2d 538, 539 (Fla. 3d DCA 1986)). Chase's ongoing use of extreme OFAC-related language, coupled with intentional disregard for known falsity and the underlying fantastical reasons which gave birth to its interdiction misconduct, establishes express malice as a matter of law. For any or all of these reasons, Chase abused the Plaintiffs and are not entitled to any privilege to defame.

**V.      Plaintiffs are entitled to focused Declaratory and Injunctive relief to stop Chase's OFAC bleeding.**

Because Chase continues to deliberately send the OFAC Sanctions Statements every time Chase touches a transaction involving Plaintiffs, legal relief alone is insufficient. Declaratory and injunctive relief is necessary and proper to stop Chase from continuing to hijack government authority by falsely implying extreme governmental sanctions against the Plaintiffs are underway. The undisputed record establishes that Chase's statements were knowingly false and continue to cause Plaintiffs irreparable harm. Declaratory relief, confirming the falsity of these statements, coupled with an injunction barring future defamatory references, is appropriate and necessary.

Declaratory relief under 28 U.S.C. § 2201 requires (1) an actual controversy between parties, and (2) that declaratory relief will clarify the parties' legal relations or terminate uncertainty. This standard is met here because: (1) an actual, continuing controversy exists as Chase continues to assert Plaintiffs are or have been under OFAC investigation, a sanctioned program and sanctioned, despite Chase knowing there is uncontroverted evidence showing the opposite; and (2) declaratory relief clarifying the falsity of Chase's statements is critical to terminating the harmful confusion created by Chase deliberately humiliating Plaintiffs. A declaratory judgment will have a practical effect because it serves to conclusively correct the public and business record, providing Plaintiffs necessary relief from the continuing and gratuitous reputational harm directly attributable to Chase's false OFAC statements. Thus, the Court should declare that:

> All statements by JPMorgan Chase Bank, N.A., asserting or implying Plaintiffs Sinai Holdings, LLC and Jacob Gitman were or are subject to OFAC sanctions, OFAC investigations, or similar governmental actions are unequivocally false and defamatory, and that Chase only published these falsehoods because their policy was made to always publish these false OFAC-related statements.

In turn, permanent injunctive relief, under Count V is appropriate whenever a party demonstrate (1) success on the merits, (2) irreparable harm if relief is withheld, (3) harm outweighs injury to defendant from injunction, and (4) public interest supports granting relief. *Levi Strauss. v. Sunrise Int'l Trading*, 51 F.3d 982, 985 (11th Cir. 1995).

Each of these factors strongly supports a narrow and equitable injunction against Chase to bring the parties back to the *status quo*. *See Canal Authority v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (holding that when the status quo causes one party irreparable harm, a relaxed injunction standard requires the parties to return to the "last uncontested status quo" necessary to prevent the

irreparable injury); *Green v. Green*, 16 So. 3d 298, 302 (Fla. 1st DCA 2009) ("Equity delights to do justice and not by halves.")

One, Plaintiffs conclusively showed that Chase knowingly made false and defamatory statements regarding nonexistent OFAC sanctions, programs or investigations. This also tortiously interfered with the entire class of prospective and present business associates of the Plaintiffs who run their transactions with or through Chase as the originating, correspondent/intermediary or beneficiary bank. *Zimmerman v. D.C.A.*, 505 So. 2d 1371, 1376 (Fla. 4th DCA 1987) (holding that "the activities enjoined constitute or are incident to conduct which constitutes intentional interference with potentially advantageous business relationships, and that the rights thus tortiously violated are entitled to be protected by equitable intervention in the form of a temporary injunction.") Plaintiffs' undisputed evidence, including admissions from Chase's employees and internal documentation, fully establishes the falsity and knowing nature of Chase's OFAC statements. Thus, Plaintiffs have shown success on merits.

Two, Plaintiffs have already suffered substantial reputational harm and financial losses directly from Chase's false OFAC statements, resulting in irreparable damage to financing relationships, creditworthiness, and ongoing business operations SMF ¶¶ 85-96. Such harm is recognized by courts as inherently irreparable given the inability to fully restore damaged reputations or regain lost business opportunities. *Jysk Bed'N Linen v. Dutta-Roy,* 810 F.3d 767, 780 (11th Cir. 2015) ("[T]he loss of customers and goodwill is an irreparable injury."); *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 61 (1975) (injunctions are designed to deter, not to compensate); *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1133 (11th Cir. 2005) (an injunction is "completely at odds with a sanction for past conduct that may be addressed by adequate remedies at law."); *id.,* (quoting *United States v. Or. State Med.*, 343 U.S. 326, 333 (1952)) ("The sole function of an action for injunction is to forestall future violations. It is so unrelated to punishment or reparations for those past that its pendency or decision does not prevent concurrent or later remedy for past violations by indictment or action for damages by those injured.")

Three, the injury to Plaintiffs absent an injunction—continued reputational and economic destruction—is severe, while an injunction places no undue burden on Chase, as it merely requires Chase to edit out two words—"OFAC" and "sanctions"—from its messaging template; it simply prohibits Chase from continuously publishing the statements that Chase already admits are editable and that it knows are always false. SMF ¶ 81. Indeed, an injunction will benefit Chase

immeasurably by securing a tourniquet around its hemorrhaging defamation-policy framework. Thus, the balance of Plaintiffs' devastating and embarrassing harms against the non-existent harm or even inconvenience to Chase to just stop publishing OFAC falsehoods around the world strongly favors remedial injunctive relief.

Fourth, an injunction promotes the public interest by preventing further deliberate misuse of governmental authority (OFAC) terminology by a major financial institution. It also maintains the integrity of OFAC's legitimate enforcement role, ensuring its severe implications are reserved only for actual governmental sanctions and international criminals, rather than manipulated for internal corporate convenience at the expense of innocent businesses. Due to the severe and ongoing reputational damage inherently presumed under Florida defamation law, Plaintiffs face a continuing threat of harm with every repetition or implication of false OFAC sanctions. This harm is not hypothetical or speculative; Florida law explicitly recognizes that the publication of such inherently defamatory statements presumes real and substantial injury to reputation. Such an injunction also furthers the public policy interest enshrined by the recent Executive Order on improper bank exclusions. Exec. Order No. 14331, 90 Fed. Reg. 38925 Particularly so, for a case like this which arises from fantastical political narratives Chase found in a blog about Russian-Trump collusion in the 2016 election interference, all of which plays explicit center stage in Chase's bad faith reasons for engaging its OFAC defamatory publication apparatus against the Plaintiffs.

Accordingly, permanent injunctive relief is not only justified but necessary to stop ongoing irreparable harm caused by Chase's false representations regarding OFAC sanctions and investigations against Plaintiffs, including restricting Chase from making, publishing, or communicating—directly or indirectly—to any third party, institution, or entity, any statement asserting, implying, or suggesting that Plaintiffs Sinai Holdings, LLC or Jacob Gitman are subject to OFAC sanctions, OFAC investigations, programs, sanctions, or any similar governmental actions absent a valid, verified governmental action.

### VI. Chase does not enjoy any statutory immunity to knowingly publish false OFAC statements

Chase's asserted immunity under the USA PATRIOT Act and the Bank Secrecy Act (BSA) fails as a matter of law because statutory immunity under these provisions is limited to good-faith reports of suspicious activity to government agencies. The relevant statutes and case law establish that immunity does not extend to knowingly false communications or disclosures that are not

submitted to appropriate government agencies, like OFAC. Here, Chase's communications were (a) knowingly false and (b) never submitted to OFAC or any agency, as Chase reiterated in its messages that "No OFAC reporting took place." SMF ¶ 73. The statements were only sent to other banks and Plaintiffs' business associates. Thus, the statutory framework and judicial interpretations of 31 U.S.C. § 5318(g)(3) and 50 U.S.C. § 1702(c) confirm these defenses fail as a matter of law.

Moreover, although section 5318(g)(3) of the BSA and section 314(b) of the USA PATRIOT can provide immunity to financial institutions and their employees for disclosures of SARs to government agencies and other institutions, case law interpreting this provision emphasizes this immunity is contingent upon the disclosure being made in good faith. In *Lopez v. First Union Nat. Bank of Florida*, 129 F.3d 1186, 1192-93 (11th Cir. 1997), the Eleventh Circuit clarified that immunity under § 5318(g)(3) only applies if the financial institution had a good-faith suspicion that the law or regulation was violated. The court also held that immunity does not apply to disclosures made without a good-faith basis, such as those based solely on verbal instructions from government officials without legal authority. *Id*. at 1193. These holdings underscore that knowingly false disclosures or disclosures made without a reasonable basis do not qualify for immunity. Thus, the expansive immunity granted by the statutes does not protect disclosures that are knowingly false or made without a legitimate basis.

No one can or does dispute that Chase never had any reasonable basis that Plaintiffs were subject to OFAC investigations, programs, or related sanctions. Nor is there any dispute that the OFAC communications were specifically not sent to OFAC or another governmental agency. Therefore, as a matter of law, Chase is not entitled to any statutory immunity because (i) the statements do not meet the statutory definitions for immunity and (ii) its complete lack of good faith as it continues to stubbornly publish these always false and extreme OFAC statements to Plaintiffs' business associates and banks around the world.

### VII. Chase's Improper Discovery Conduct Warrants Sword-Shield Sanctions and/or an Adverse Inference (Fed. R. Civ. P. 37(c), 56(d)).

Chase's pattern of discovery abuse has severely prejudiced Plaintiffs' ability to prosecute their claims fully. Chase has selectively withheld critical internal GFIU and AMLOC documents necessary to establish its lack of good faith, while selectively disclosing other documents advantageous to its defenses. *see* Plaintiffs' Motion for Clarification and Reconsideration, at 4-9 [DE 157]; Plaintiffs' Reply, at 2-6 [DE 166]. This textbook sword-and-shield misconduct requires

meaningful judicial intervention. Plaintiffs request that the Court either exclude Chase from relying on withheld documents or facts, or apply an adverse inference that the withheld materials conclusively demonstrate Chase's knowledge, lack of good faith, and intentional deviation from its own internal policies. Plaintiffs understand that the Court may have or will rule on related matters in pending motions, but such is referenced here to preserve the issues and to make the Court aware of the method the Plaintiffs believe the law requires the Court to employ when reviewing the summary judgment evidence.

**VIII. Chase's Affirmative Defense of Failure to Mitigate Fails as a Matter of Law**

Chase alleges that Plaintiffs failed to mitigate their damages caused by Chase's defamatory statements. This affirmative defense is wholly unsupported by the record and fundamentally misapplies Florida defamation law.

Chase may argue Plaintiffs should have mitigated damages by clarifying false OFAC allegations sooner. But this contention ignores reality: Plaintiffs immediately and repeatedly attempted clarification, but Chase continued to propagate false statements regardless. Under Florida law, mitigation obligations never extend to correcting repeated defamatory falsehoods continuously broadcast by the very party making them. Plaintiffs had no practical opportunity to mitigate what Chase actively refused to stop

First, it is settled Florida law that in cases involving defamation per se—particularly those alleging serious criminal wrongdoing, terrorism, or similar severe allegations—general damages are presumed. *See Wolfson*, 273 So. 2d at 776. And "[t]here is no actual 'duty to mitigate,' because the injured party is not compelled to undertake any ameliorative efforts." *Sys. Components Corp. v. Fla. Dep't of Transp.*, 14 So. 3d 967, 982 (Fla. 2009). The doctrine just prevents a party from recovering damages it could reasonably have avoided. *Id.* (citation omitted). The plaintiff is only accountable for hypothetical actions that could be accomplished through "'ordinary and reasonable care,' without requiring undue effort or expense." *Id.* (citation omitted).

Second, Plaintiffs took all reasonable measures available to mitigate the damage inflicted by Chase's false OFAC statements. Plaintiffs repeatedly contacted Chase, sought immediate clarification, demanded retractions, and engaged in direct communications with banks, vendors, and business partners to correct Chase's falsehoods. But each time Plaintiffs acted to correct Chase's defamatory falsehoods, Chase immediately and continuously republished the same false OFAC-related statements, effectively neutralizing any mitigation Plaintiffs could reasonably accomplish.

Third, even assuming a mitigation obligation, which Plaintiffs satisfied, Chase's continued republication of the defamatory statements constitutes express malice that would defeat any mitigation-based defense. The Fifth Circuit's decision in *Diplomat Electric* is directly instructive: once a defaming party becomes aware of the falsity or unreliability of its statements and fails to stop or correct their publication, such ongoing defamation demonstrates intentional malice. "Where a person has published a false statement and information thereafter comes to him from a reliable source which would put a reasonable person on inquiry as to the truth of such statement, and instead of making such inquiry he wilfully republishes the false statement, the repetition of the defamation is strong evidence of malice." *Diplomat Electric*, 430 F.2d at 44.

Here, Chase was clearly and repeatedly informed—by Plaintiffs, sworn testimony, documentary evidence, and direct communication from third parties—that its OFAC-related statements were false. Rather than ceasing or correcting the publications, Chase doubled down, repeatedly republishing the same defamatory messages. Thus, under *Diplomat Electric*, this continuing republication conclusively demonstrates Chase's express malice, conclusively undermining its mitigation defense.

Fourth, Plaintiffs' duty to mitigate does not extend to correcting false information continuously and deliberately published by the very party responsible for the harm. *See Sys. Components*, 14 So. 3d at 982. Here, Plaintiffs repeatedly faced Chase's consistent and deliberate refusal to cease publication of the defamatory statements, rendering any mitigation attempt futile. Plaintiffs repeatedly sought to rectify Chase's defamatory falsehoods only to have Chase sabotage each effort by immediately republishing and reaffirming its false accusations.

Because (1) Florida law presumes damages for defamation per se without imposing futile mitigation requirements; (2) Plaintiffs did reasonably attempt mitigation repeatedly, only to be consistently frustrated by Chase; (3) Chase's ongoing and long-knowing republication of false statements constitutes express malice and defeats any mitigation defense; and (4) the law only requires Plaintiffs to engage in reasonable efforts without undue expense, Chase's affirmative defense of failure to mitigate fails as a matter of law. Plaintiffs are thus entitled to summary judgment dismissing Chase's mitigation defense entirely.

IX. **Defendants' Preclusion Arguments Fail: Plaintiffs' Claims Are Not Barred by Collateral Estoppel or Res Judicata**

Chase argues that the Monarch litigation bars Plaintiffs' claims. It does not. Plaintiffs Jacob Gitman and Sinai were not parties to the Monarch action, and the causes of action and factual

underpinnings differ materially. *See Monarch Air Group LLC, v. JPMorgan Chase Bank, N.A.*, Case No.: 21-cv-62429.

### a. Plaintiffs' Claims Arise from Distinct Statements and Transactions

Chase made new, independent defamatory statements about Plaintiffs after the Monarch case—directly targeting Plaintiffs through separate transactions and counterparties. These defamatory OFAC messages were issued following the Monarch litigation and caused fresh reputational harm to different entities in different contexts. Plaintiffs are not relitigating Monarch; they challenge distinct messages sent to third parties that falsely referenced OFAC investigations involving them. *See Taylor v. Sturgell*, 553 U.S. 880 (2008); *Pearce v. Sandler*, 219 So. 3d 961, 966 (Fla. 3d DCA 2017).

Chase's internal policies and messaging confirm that the OFAC statements here were not the subject of prior adjudication. Internal documents reference Gitman and Sinai by name in conjunction with "OFAC Investigations," while Chase now claims no such investigations existed. These contradictions demonstrate that the defamatory nature of the messages remains a live, unadjudicated issue.

### b. Collateral Estoppel Does Not Apply

Issue preclusion requires that identical factual issues were actually litigated and necessarily decided in a prior action between the same parties or their privies. *Mass v. State,* 927 So. 2d 157, 160 (Fla. 3d DCA 2006); *Stogniew v. McQueen*, 656 So. 2d 917, 919 (Fla. 1995). Chase cannot meet that here. Plaintiffs claims are based on Chase's continued issuance of false statements well after the Monarch case was filed or decided. These new acts include Chase's knowledge of systemic problems following Monarch and its refusal to correct its messaging protocols. The Monarch plaintiffs could not have litigated post-judgment defamation against Gitman or Sinai.

### c. Plaintiffs Are Not in Privity With Monarch Plaintiffs

Under both Florida and federal law, a party is not bound by an earlier judgment unless they were a party or in privity with a party in the earlier litigation. *Taylor*, 553 U.S. at 892–93. The six limited exceptions for binding nonparties, such as agreement, legal relationships, class action representation, control, agency, or statutory schemes, do not apply here. *Id*. at 893–96.

Chase claims that Gitman and Sinai were "clearly in privity" with the Monarch plaintiffs, but can offer no factual basis for that conclusion. Jacob Gitman was a minority shareholder in Monarch during the relevant period and had no control over its litigation. David Gitman had no ownership in Sinai and did not participate in the relevant Chase transactions. Chase's assertions are

unsupported and contradicted by the record. Nor is there support for Chase's reliance on "virtual representation," a theory the Supreme Court rejected in *Taylor. Id.* at 896–901. Plaintiffs had no control over the Monarch litigation, no legal relationship with the parties, and no procedural protection. Preclusion cannot apply.

### d. Claim Preclusion Fails Due to Distinct Causes of Action and Parties

Under Florida law, claim preclusion (res judicata) applies only when four identities exist: (1) thing sued for; (2) cause of action; (3) parties; and (4) quality of persons. *Tyson v. Viacom, Inc.*, 890 So. 2d 1205, 1209 (Fla. 4th DCA 2005). None are satisfied here.

The defamatory statements here involve new publications, different audiences, and distinct harm to different entities. Defamation is publication-specific. *Maloney v. Heftler Realty*, 316 So. 2d 594, 596 (Fla. 2d DCA 1975). The causes of action arose after Monarch's complaint was filed and concern unique recipients and transactions. Overlapping language in OFAC statements does not render the claims identical. *See Youngblood v. Taylor*, 89 So. 2d 503, 506 (Fla. 1956).

Because Plaintiffs were not parties to Monarch and the defamatory statements and claims are new and materially different, neither collateral estoppel nor claim preclusion bars the present action. Chase's defenses fail as a matter of law.

## CONCLUSION

The undisputed evidence shows that Chase falsely associated Plaintiffs with OFAC investigations, programs and sanctions, despite knowing no such government action existed. These defamatory messages were disseminated to third parties across the banking system, inflicting lasting and severe harm. Chase has acknowledged both the inaccuracy of its messaging and the absence of any lawful basis for the designations.

Plaintiffs respectfully request that the Court grant summary judgment on Counts I through IV, enter declaratory and injunctive relief on Counts V and VI, and reserve the issue of damages for trial.

## REQUEST FOR HEARING

Plaintiffs request a hearing to assist the Court in resolving these multi-layered issues and estimates that 120 minutes would be sufficient for both sides to present argument.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed and served via the CM/ECF portal on September 12, 2025 to: JONES DAY 600 Brickell Ave., Suite 3300, Miami, FL, 33131, Eliot Pedrosa, Esq., epedrosa@jonesday.com; Amanda L. Dollinger Esq., adollinger@jonesday.com; and Taylor Cavaliere Jones, Esq., tcavaliere@jonesday.com.

Respectfully submitted,

By: /s/ *Joshua R. Kon, Esq.*
**STOK KON + BRAVERMAN**
1 East Broward Blvd, Suite 915
Fort Lauderdale, FL 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com

JOSHUA R. KON, ESQ.
Florida Bar No. 56147
(jkon@stoklaw.com)
YOSEF KUDAN, ESQ.
Florida Bar No. 1010261
(ykudan@stoklaw.com)
DAVID I. ROSENBLATT, ESQ.
Florida Bar No. 1008131
(drosenblatt@stoklaw.com)

*Counsel to Plaintiffs Sinai Holdings, LLC and Jacob Gitman*